U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED
FEB 28 1969
ALTON L. CURTIS, CLERK
By: [signature]
Deputy

Gwen Boudreaux, et al — Civil Action No. 11,351

versus

St. Mary Parish School Board, et al

TO THE JUDGES FOR THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

Pursuant to an order of this Court contained in its judgment of November 14, 1968, the School Board of St. Mary Parish, Louisiana, has authorized and directed me as Superintendent of Schools to make the following report.

In order to familiarize the Court with pertinent data concerning the St. Mary Parish School System the following geographical facts and historical information pertaining to the integration of the races are presented.

The St. Mary Parish Public School System comprises the entire civil Parish of St. Mary. There are 709 square miles of area of which 104 square miles are inland waters.

The total population is approximately 48,833. Of this amount 33,755 are of the white race, 14,950 are Negroes, and 128 are of other race origin, based on the 1960 census.

The total school population of the St. Mary Parish Public School System as of September 9, 1968, the opening day of the school year, was 10,580 white students and 5,403 Negro students. This constituted a total of 15,983 students.

As of September 9, 1968, there were 701 teachers in the St. Mary Parish School System. Of this amount 455 are white and 246 are Negro.

The median divisional line of St. Mary Parish is the Wax Lake Outlet Canal located on the western boundary of the Fifth Ward and the eastern boundary of the Fourth Ward. There are approximately 26,501 persons in the eastern sector and 22,332 in the western section of the parish.

There are 28 public schools in the St. Mary Parish School System. Eighteen of the schools were formerly all white and nine formerly all Negro, with one newly created special education school which is ungraded.

The breakdown as to students and teachers is as follows:

| Name of Schools | Students White | Students Negro | Teachers White | Teachers Negro | Formerly |
|---|---|---|---|---|---|
| J. S. Aucoin Elem. | 426 | 16 | 16 | 3 | All-white |
| Baldwin Elementary | 225 | 7 | 8 | 2 | All-white |
| Bayou Vista Elem. | 797 | 0 | 27 | 3 | All-white |
| Berwick Elementary | 1019 | 79 | 37 | 4 | All-white |
| Berwick Elementary Special Ungraded | 32 | 10 | 3 | 1 | |
| Berwick High School | 429 | 7 | 23 | 3 | All-white |
| Centerville High | 391 | 46 | 22 | 2 | All-white |
| Charenton Elem. | 231 | 12 | 7 | 2 | All-white |
| E. A. Crowell Elem. | 687 | 26 | 26 | 3 | All-white |

| Name of Schools | Students White | Students Negro | Teachers White | Teachers Negro | Formerly |
|---|---|---|---|---|---|
| W. P. Foster Elem. | 293 | 43 | 13 | 3 | All-white |
| Franklin High | 869 | 62 | 47 | 2 | All-white |
| Thomas Gibbs Elem. | 0 | 466 | 0 | 18 | All-Negro |
| Glencoe Elem. | 70 | 41 | 3 | 2 | All-white |
| G. W. Hamilton Elem. | 0 | 330 | 0 | 16 | All-Negro |
| Mary Hines Elem. | 0 | 338 | 1 | 15 | All-Negro |
| E. F. Jacquet Elem. | 0 | 123 | 1 | 6 | All-Negro |
| LaGrange Elementary | 292 | 10 | 11 | 2 | All-white |
| J. B. Maitland Elem. | 579 | 76 | 23 | 3 | All-white |
| Morgan City High | 1043 | 42 | 53 | 4 | All-white |
| M. E. Norman Elem. | 512 | 5 | 18 | 3 | All-white |
| Park Avenue High | 0 | 822 | 2 | 36 | All-Negro |
| Patterson High School | 1097 | 122 | 48 | 4 | All-white |
| M. D. Shannon Elem. | 986 | 71 | 36 | 5 | All-white |
| Verdunville Elem. | 0 | 182 | 2 | 7 | All-Negro |
| Hattie A. Watts High | 0 | 463 | 2 | 21 | All-Negro |
| Sumpter Williams High | 0 | 584 | 2 | 28 | All-Negro |
| Willow Street Elem. | 0 | 1356 | 2 | 46 | All-Negro |
| Wyandotte Elementary | 602 | 64 | 22 | 2 | All-white |

In October of 1965, prior to the present court ordered Freedom of Choice Plan, St. Mary Parish School Board abolished all attendance zones and districts that previously existed. Students were assigned based on a number of factors including choice of school by student. The results of these assignments were that in 1965-66, there were three Negro children attending formerly all white schools and no whites attending formerly all Negro schools. In 1966-67, there were 98 Negro children attending formerly all white schools and no whites attending formerly all Negro schools. There were no Negro teachers in formerly all white schools, nor were there any white teachers in formerly all Negro schools during this two year period.

The freedom of choice plan, under which the St. Mary Parish School Board is presently operating, was ordered by the Federal Court on May 2, 1967. The results of this freedom of choice plan for the 1967-68 school session showed that 467 Negro students attended formerly all white schools. No white students chose to attend formerly all Negro schools. There were 25 Negro teachers teaching full-time in formerly all white schools and 8 white teachers teaching full-time in formerly all Negro schools.

Choice forms for the 1968-69 session were distributed on March 1, 1968. A choice form for every pupil in the system is on file at the office of the St. Mary Parish School Board.

As of September 9, 1968 there were 739 Negro students attending formerly all white schools and no whites attending formerly all Negro schools. The number of Negro teachers teaching in formerly all white schools increased to 53, and the number of white teachers teaching in formerly all Negro schools increased to twelve.

The school bus transportation system of St. Mary Parish has been desegregated in accordance with the freedom of choice decree. Transportation is furnished, regardless of race, to any student who is eligible for bus transportation. Due to the fact that the public schools of St. Mary Parish have an early opening hour, and due to the vast land area of the parish, it is impossible to provide transportation for any student to any school in the parish. Consequently transportation is furnished if a bus passes in the vicinity of the students home, and if it serves the school chosen by the student. Wherever time would permit, buses were rerouted so that they could serve the schools chosen. There are now twenty-two school buses that are integrated as a result of the implementation of freedom of choice plan. This represents approximately thirty percent of the total number of school buses in the parish. All other buses will be integrated when the students exercise a choice of school requiring the use of a bus transporting students of the opposite race.

In summary, the progress of pupil integration in St. Mary Parish for the respective school years is as follows:

(a) 1965-66 - 3 Negro children elected to attend formerly all white schools.

(b) 1966-67 - 98 Negro children elected to attend formerly all white schools.

(c) 1967-68 - 467 Negro children elected to attend formerly all white schools.

(d) 1968-69 - 739 Negro children elected to attend former-all white schools.

On March 1, 1969, a freedom of choice form will be given to every child registered in the public schools as of that date. In the past, there has been a substantial increase in pupil integration for each of the years during which the freedom of choice plan has been utilized in St. Mary Parish. There is every reason to expect that there will be a substantial increase in pupil integration in September 1969. In addition to the trend or pattern of growth in integration cited above which will foster additional percentage growth in pupil integration in September 1969, the St. Mary Parish School Board has increased faculty integration during the 1968-69 school year by twenty teachers, or approximately sixty percent over the 1967-68 school year. This increase is far in excess of that required by the Jefferson Decree. It is expected that this increase in faculty integration will favorably affect the percentage growth of pupil integration in September 1969.

The St. Mary Parish School Board intends to and will increase faculty integration for the school year 1969-70 beyond that level established in the 1968-69 school year.

However, there is a critical shortage of available teachers in the public school system of Louisiana. For example, in late June 1967, before the opening of the school year 1967-68, St. Mary Parish School Board was experiencing a shortage of some thirty teachers wherein the school board simply did not have the teachers to put in the rooms to teach the children. The total number of

teachers needed for the school year 1968-69 was 701 and there were 180 vacancies to fill. These vacancies resulted because of resignations and transfers of teachers, and the annual school enrollment growth attributed to population growth.

Because of the critical shortage of teachers mentioned above, the school board is in a particularly disadvantageous position in that heretofore it could not insist that a teacher take an assignment which that teacher did not wish to take, because the teacher had the option of moving to another system within or without the state, or of simply changing professions. When an "involuntary" teaching assignment is made, the teacher has the option to simply refuse the assignment. The St. Mary Parish School Board has no method or jurisdiction with which to force any individual to accept an assignment refused by the applicant.

In addition to the problem of teacher shortage in general, it should be noted that there are certain classifications and criteria concerning vacancies. Because of the structure of a school system, it is necessary to sub-divide vacancies into areas of special training and certification requirements. Hence, teachers are certified by the State Department of Education in particular areas of the curriculum. These areas are often specialized and restrictive to the point that the teacher can be considered only for a position in her area of specialization and no other, no matter how many positions are unfilled in the system. The matter of teacher procurement then becomes more complicated when one must seek a person with special training to fill a specialized position. No one applicant is eligible to fill "any" vacancy which might exist in a particular system. Applicants must be offered positions in keeping with their training and areas of certification. Teachers holding lower elementary certificates certainly could not be employed to teach high school mathematics, and vice versa.

It is under the foregoing facts and circumstances that the St. Mary Parish School Board seeks to increase faculty integration for the school year 1969-70.

The St. Mary Parish School Board, working within the confines of the criteria enumerated above, has also had to fill numerous vacancies since November 14, 1968, the date of the last report to this Court made by St. Mary Parish School Board. Applicants who were placed in positions were generally persons who had not applied previous to the date of our report. Some were qualified persons within the community who were willing to accept positions because they were aware of the critical shortage of teachers. Others were graduates from, and outside, the community who were graduating from college at mid-semester. Not all applicants were willing to accept positions in St. Mary Parish because of more attractive offers from other parish systems.

There was a total of twenty-one (21) Negro applications, and of these nine (9), or 42.8% were hired and placed in area schools. Two (2) replaced unsuccessful white teachers in Negro schools, two (2) were new positions in Negro schools, and five (5) were hired to replace Negro teachers in Negro schools.

There was a total of fifty-six (56) white applications, and of these, twenty-two (22), or 39.3% were hired and placed in area schools. Two (2) replaced unsuccessful Negro teachers in white schools. Four (4) were hired to teach in Negro schools, and of these one (1) replaced a white teacher in a Negro school, while three (3) replaced Negro teachers in Negro schools. One (1) was a new position in a white school and fifteen (15) replaced white teachers in white schools.

The foregoing assignments were made in terms of availability of qualified teachers. However, it must be pointed out that in the St. Mary Parish School System, 66.2% of the pupils are white, and 33.8% are Negro. The proportionate hiring of a greater percentage of Negro teacher applicants than white applicants will increase Negro influence in the total faculty complement, and will increase the availability of crossover teachers. Also, for the Court's consideration, the following table is offered to show on a cumulative basis the hiring practices of the St. Mary Parish School Board during the last three years:

| | White | Negro | Total | % White | % Negro |
|---|---|---|---|---|---|
| 1966-67 | 424 | 211 | 635 | 66.77 | 33.22 |
| 1967-68 | 430 | 226 | 656 | 65.5 | 34.5 |
| 1968-69 | 455 | 246 | 701 | 64.9 | 35.0 |

The total teaching staff has been increased over the last report by two (2) new teachers. These are two (2) new Negro music teachers for predominantly Negro schools. This service had not been possible before because of a lack of trained personnel.

The Court is reminded that changes during the regular school year are usually necessary for three (3) major reasons:

(a) Inexperienced teachers resign because of an inability to adjust academically and emotionally to certain classroom situations. They must be replaced as soon as possible with the best personnel available.

(b) Our area is one with a very mobile and highly itinerant population. Many teachers have husbands employed by major oil and/or service companies. Some are transferred at a moment's notice and need to be replaced from current applicants and/or community resources.

(c) Maternity leaves of course must be granted when application therefor has been made. Seven vacancies during this term have occurred thus far due to maternity leaves. Since they do not all occur at the same time, they usually are filled on request from community resources.

In many instances it is impossible to wait until the area colleges and universities graduate personnel who might be capable of filling these positions. Hence, it can be seen that the St. Mary Parish School Board, in spite of its intent to hasten the desegregation of faculties, does not enjoy, during the regular school session, the privilege of eclectic assignments as it might during the summer months when it plans for a new school year.

A teacher survey will be conducted shortly and a questionnaire given to teachers concerning their availability to fill positions in schools predominantly attended by the opposite race.

These responses will be used first as the basis for making voluntary transfer assignments of teachers presently in the system. New applicants will be primarily assigned, also, in accord with their willingness to accept such positions. It is anticipated that after the crossover seminars described hereinafter are conducted, there will be a greater availability of crossover teachers. In the event there is an insufficient number of teachers who will agree to a crossover, then the St. Mary Parish School Board will, of necessity, resort to involuntary assignments.

It must be pointed out that involuntary assignments are obviously undesirable not only because of refusal of assignment and resulting loss of teachers, but because such assignments create adverse attitudes on the part of the teachers. There are already a considerable number of problems which must be dealt with by a crossover teacher without having such a teacher begin an assignment with a poor or negative attitude. At the present time, it is the experience of the St. Mary Parish School Board that even some volunteer crossover teachers who apparently begin with proper attitudes are unable to cope with all of the problems and are therefore unsuccessful and must resign. Since the report of November 14, 1968, four (4) white teachers assigned to predominantly Negro schools have resigned. Thus, neither involuntary assignments nor totally voluntary assignments offer a panacea to this problem. It must be added, however, that many voluntary crossover teachers have been highly successful and have shown no desire to be released from their duties. The Board is hopeful that they may be of some help in influencing others to join them.

The St. Mary Parish School Board, in its effort to further desegregate faculties of its area schools, and thus foster further pupil integration, proposes to adhere to the following plan wherever it is possible to do so:

(a) Proportionate to the percentages of races, as many vacancies as possible will be filled with teachers of the opposite race. As has been stated in a previous report, and hereinabove, involuntary assignments are not in the best interest of the races

or the profession. The Board feels that arbitrary assignment is a last resort, but involuntary assignment will be used if it is impossible to properly staff schools otherwise.

(b) As has been indicated repeatedly, the major difficulty experienced by the St. Mary Parish School Board has been the availability of qualified crossover teachers, that is, teachers who are capable of successfully teaching in a school predominantly attended by pupils of the opposite race. In an effort to overcome this difficulty, the St. Mary Parish School Board has solicited the services of the Educational Resource Center on School Desegregation, of New Orleans, Louisiana, in order to utilize the services available at this Resource Center. Among other services, the Resource Center will conduct crossover seminars for the teachers of St. Mary Parish.

(c) It is the intent of the St. Mary Parish School Board to offer crossover positions to as many new applicants as is possible. This is because most or all of our colleges and universities have been very successful in building proper attitudes in young people concerning working with and teaching the opposite race. It has been the experience of the Board that it is far easier to get new teachers to make the transition than those who are already established in the system.

In a further effort to desegregate schools, and foster integration of students, the St. Mary Parish School Board has also accomplished, or will accomplish, the following:

(a) In Berwick, Louisiana, one small Negro school was closed at the end of the 1967-68 session and its teachers and students were absorbed into the area white schools. There is no longer a formerly all Negro school in the Berwick Community.

(b) In Morgan City, Louisiana, a new junior high school, designed for 1500-2000 students will be completed in the near future. At that time, it is planned that all 7, 8 & 9th grade students, Negro and white, in the area will attend this single facility. Teachers of both races will be absorbed with students. Further, it

is anticipated that the remaining teachers and high school students at Sumpter Williams High School, a predominantly Negro school, will be absorbed into the Morgan City High School, a predominantly white school. There will then be no formerly all Negro High School in the Morgan City-Berwick area. This area comprises almost one half of St. Mary Parish.

(c) The Centerville Community, which has a high percentage Negro population, has only one high school serving that area. There is, therefore, only one high school available for all students, and students who do not choose to attend this high school are transported to one of the high schools of their choice in the Franklin area, some five (5) miles away.

(d) The St. Mary Parish School Board has increased and integrated its Child Welfare and Attendance Staff. This staff supervises the attendance, health and special education services offered by the St. Mary Parish School Board. This office also acts as liaison agent for other local and state agencies which deal with child welfare, for example, Terrebonne Mental Health Center, University of Southwestern Louisiana Special Education Department, and the Louisiana State Department of Public Welfare. This staff consists of two registered nurses, four attendance officers, one secretary and the supervisor. This staff is integrated to the extent that two of the four attendance officers are Negro and two are of the white race. Both of the school nurses are white only because of the requirement for and scarcity of registered nurses. A Negro registered nurse to fill any future vacancy, will be hired when and if that vacancy occurs, if such a person is available at that time. One nurse, one white attendance officer and one Negro attendance officer are assigned to East St. Mary Parish. One nurse, one white attendance officer and one Negro attendance officer are assigned to West St. Mary Parish. This staff offers a good amount of service which is helpful to all races. The personnel, of course, work in all schools, however, Negro children and families need more specialized assistance. Clean and healthy children are much easier to educate and to integrate

into schools where they are of the minority race. Accordingly, with that as an objective, the staff spends a great majority of its time with Negro families. As stated above, the attendance officers are permitted to work with children of both races and are permitted to work in all schools. Generally, an integrated team patrols whenever feasible. In this manner, attendance officers of both races are recognized as equal under the law and due the same amount of respect from truants and their families of both races. All hearings on the attendance of, or discipline of, delinquent children or parents are attended by attendance officers of both races regardless of the race of the defendants. Attendance officers of both races attend all juvenile court hearings regardless of the race of the defendants. The Negro attendance officers are encouraged to work on behalf of their own race, and both are active leaders in the NAACP and other civil rights organizations. They are also active in American Legion and other community service organizations. The white attendance officers are men who also give a large amount of their time to community service organizations. A close study of the statistical summary of cases of this department shown in Exhibit I attached in this report will show that Negro children are receiving a large portion of services which are aimed towards including the Negro child into the school system and not systematically excluding him. Some measure of success is achieved by:

(1) encouraging the child who is without encouragement at home;

(2) furnishing, or securing, health services to the child not well enough or too handicapped to attend regularly;

(3) teaching the homebound at home;

(4) filing charges against and prosecuting those who prevent children from attending school regularly. All action taken is without regard to race, or to school attended. This staff is vitally concerned with the success of those who have been integrated into various schools by helping them achieve some measure of success in their new situation and by seeing that all attend as

regularly as possible so that fewer problems will result.

(e) The St. Mary Parish School Board is conducting an ancillary reading project in its area schools. This project is funded under Title I of the Elementary and Secondary Education Act. Since this reading program is carried on primarily in those schools which serve economically deprived children, it is designed to augment existing methods and facilities for diagnosis and remediation of reading problems and disabilities. There is a high correlation between reading problems and disabilities and the economically and educationally deprived children. The project is currently being carried on in thirteen (13) of the twenty-eight (28) public schools of St. Mary Parish. Eight of these are predominantly Negro schools with a collective enrollment of 4,691. Five (5) are predominantly white schools with a collective enrollment of 4,290, of which 358 are Negro. In addition, the services of the project are offered to an additional 232 Negro students in predominantly white schools which are not classified as project schools. Therefore, the project is directed to a total of 5,281 Negro children and 3,932 white children. This project includes two (2) teachers, one (1) white and one (1) Negro, and thirty-one (31) teacher aides, thirteen (13) white, and eighteen (18) Negro. Library aides are provided to all project schools; six (6) are white, nine (9) are Negro. There are twelve (12) instructional secretaries, five (5) are white and seven (7) are Negro. The reading project has been instrumental in making integration in project schools and other schools easier to implement. Additional equipment and materials have been provided schools to conduct the reading program. This has helped children who were formerly in Negro schools to have new experiences in the classroom which are challenging and rewarding to him and which have given him added self-confidence; all of which better prepares him for the new experiences of integration. The program of the reading project helps the slower learner by enabling him to remain with the class group and at the same time receive individual reading instruction which prepares him to keep up with the group academically and at the same time develop his self-confidence and his ability to keep up with the group socially.

Teacher attitude toward integrated classes has been improved through integrated workshops and conferences of teachers, giving them a chance to work with teachers of the opposite race and to gain insight into pupil-teacher relationships on an integrated basis. Special programs for slow learners and disadvantaged children have been possible through the two reading laboratories and through the use of teacher aides provided in the project schools. The Board is hopeful that this thrust of services to these educationally and economically deprived children will help them to make the crossover transition less painfully, and with a higher degree of success.

(f) In addition to providing extended educational opportunity to many youths, the planning and operation of the Title I project has afforded St. Mary Parish School Board many opportunities to work closely with other agencies in the Parish. Some of the agencies include Community Action Committee Association, Incorporated, (funded by the Office of Economic Opportunity); Park Avenue Parent Club, a patron club of a predominantly Negro school; St. Mary Parish Health Unit; The Archdiocesan Superintendents of New Orleans and Lafayette; St. Mary Parish Public Library; and Willow Street Parent Teacher Association, a patron club of a predominantly Negro school. School personnel have consulted with and sought advice on and approval of project activities from these and other similar groups.

(g) In addition to its effort to desegregate faculties and staffs, St. Mary Parish School Board, in an effort to create an atmosphere of familiarity, has found occasion in several instances, to place persons of the opposite race in schools providing lunch services to children, and to integrate some maintenance crews and janitorial complements. Three predominantly white schools have Negro employees in the school cafeteria. Two of these staffs are integrated. One school has an integrated janitorial staff. There are a total of six (6) maintenance workers in the parish, three (3) white and three (3) Negro.

The Court is reminded that non-professional jobs are usually vacated only after long periods of service and that re-

placements are made in keeping with the ability and willingness of the applicants to accept and perform duties in integrated situations. The St. Mary Parish School Board will attempt to fill future non-professional positions in keeping with this newly established policy.

From all of the foregoing, it is expected, with reason, that the responses of students and parents during the freedom of choice period beginning March 1, 1969, will show an increase in the number of children making the crossover from Negro to white schools.

The St. Mary Parish School Board has taken every opportunity at its disposal and within its jurisdiction to go beyond that which is required by the Jefferson Decree in an effort to achieve proper integration of the races in the public school system under the freedom of choice plan now in effect in St. Mary Parish. This has been accomplished in spite of the many limiting factors concerning availability of teachers that have existed and will continue to exist. It is submitted that these efforts have been very fruitful when considering the increase in pupil integration which the St. Mary Parish School Board has successfully achieved under the freedom of choice plan now in effect.

It is the professional opinion of the staff of the St. Mary Parish School Board that freedom of choice will ultimately result in the proper integration of pupils contingent upon the geographic distribution of families and their proximity to the area schools. It appears from evidence submitted in prior affidavits that there is a distinct yearly increase in enrollment of Negro children in predominantly white schools with a corresponding decrease of enrollment of Negro children in predominantly Negro schools. When this is coupled with the effort being made to integrate faculties, and that which has been done and is planned concerning the consolidation of schools, it is obvious that the St. Mary Parish School Board will ultimately achieve integration of the races limited only by a truly free choice of the individual, accessability to schools, transportation facilities, and availa-

bility of physical facilities to adequately house student enrollments. It must be emphasized that all of this has been accomplished in St. Mary Parish under a freedom of choice plan successfully, and without substantial lowering of educational standards. It is the professional opinion of the staff of the St. Mary Parish School Board that proper integration of the races in this school system can be successfully accomplished only through a freedom of choice plan. It is axiomatic that students learn more easily in an environment of their own choosing. It is the opinion of the professional staff of this school board that in the event freedom of choice is abandoned in favor of zoning, whereby children of both races are forced to attend schools not of their choosing, the result will be the destruction of the progress made thus far in successful educational integration of the races. Education, like most professions, is indeed much more than a numbers game.

Respectfully submitted:

St. Mary Parish School Board

By: 
B. Edw. Boudreaux
Superintendent

E X H I B I T I

CASES HANDLED BY THE VISITING TEACHER
7/1/64 thru 6/30/65

| | WHITE | NEGRO | TOTAL |
|---|---|---|---|
| A. NUMBER OF ATTENDANCE CASES HANDLED | 31 | 106 | 137 |
| NUMBER OF OTHER CASES HANDLED | 194 | 30 | 224 |
| TOTAL OF ALL CASES HANDLED | 225 | 136 | 361 |

B. EVALUATION OF PRIMARY CAUSES IN ATTENDANCE CASES ONLY

| | WHITE | NEGRO | TOTAL |
|---|---|---|---|
| 1. Community Environment | 1 | 7 | 8 |
| 2. Economic Problems | 8 | 41 | 49 |
| 3. Educational Problems | | 4 | 4 |
| 4. Family Problems | 13 | 39 | 52 |
| 5. Health Problems (Child and/or Family) | 2 | 6 | 8 |
| 6. Personality and Adjustment Problems (Child) | 7 | 9 | 16 |

C. EVALUATION OF PRIMARY CAUSES IN OTHER CASES HANDLED *

| Primary Problem | Race | Male | Female |
|---|---|---|---|
| Vision | White | 4 | 7 |
| | Negro | 0 | 0 |
| Hearing | White | 2 | 2 |
| | Negro | 0 | 0 |
| Speech ** | White | 1 | 1 |
| | Negro | 0 | 0 |
| Mental Retardation | White | 46 | 21 |
| | Negro | 10 | 5 |
| Mentally Gifted | White | 0 | 0 |
| | Negro | 0 | 0 |
| Social and/or Emotional | White | 61 | 23 |
| | Negro | 13 | 2 |
| Psychotic | White | 0 | 0 |
| | Negro | 0 | 0 |
| Crippled | White | 1 | 0 |
| | Negro | 0 | 0 |
| Special Health Problems | White | 11 | 5 |
| | Negro | 0 | 0 |
| Academic and/or Environmental Retardation | White | 6 | 3 |
| | Negro | 0 | 0 |
| Normal Child - Evaluation Shows No Exceptionality | White | 0 | 0 |
| | Negro | 0 | 0 |
| Total | White | 132 | 62 |
| | Negro | 23 | 7 |
| Total Cases | White | 194 | |
| | Negro | 30 | |
| Total Cases - All | | 224 | |

* For statistical purposes, the most severe problem was tabulated as the primary cause of the child's problems. In most cases the primary problem was either compounded by or resulted in other problems.
Example: Many mentally retarded children also had vision, hearing and speech problems; psychotic children are socially and emotionally maladjusted; etc.

** Cases handled by speech therapist, 92 receiving therapy and 118 on waiting list not included, since these will be found on a separate report.

CASES HANDLED BY THE VISITING TEACHER
7/1/65 thru 6/30/66

| | WHITE | NEGRO | TOTAL |
|---|---|---|---|
| A. NUMBER OF ATTENDANCE CASES HANDLED | 130 | 183 | 313 |
| NUMBER OF OTHER CASES HANDLED | 251 | 119 | 370 |
| TOTAL OF ALL CASES HANDLED | 381 | 302 | 683 |
| B. EVALUATION OF PRIMARY CAUSES IN ATTENDANCE CASES ONLY | | | |
| 1. Community Environment | 2 | 17 | 19 |
| 2. Economic Problems | 15 | 62 | 77 |
| 3. Educational Problems | 11 | 17 | 28 |
| 4. Family Problems | 57 | 58 | 115 |
| 5. Health Problems (Child and/or Family) | 12 | 16 | 28 |
| 6. Personality and Adjustment Problems (Child) | 33 | 13 | 46 |

C. EVALUATION OF PRIMARY CAUSES IN OTHER CASES HANDLED*

| Primary Problem | Race | Male | Female |
|---|---|---|---|
| Vision | White | 4 | 17 |
| | Negro | 14 | 37 |
| Hearing | White | 2 | 7 |
| | Negro | 0 | 1 |
| Speech** | White | 2 | 1 |
| | Negro | 0 | 1 |
| Mental Retardation | White | 61 | 24 |
| | Negro | 11 | 9 |
| Mentally Gifted | White | 0 | 0 |
| | Negro | 0 | 0 |
| Social and/or Emotional | White | 68 | 22 |
| | Negro | 9 | 7 |
| Psychotic | White | 0 | 1 |
| | Negro | 3 | 0 |
| Crippled | White | 0 | 0 |
| | Negro | 0 | 0 |
| Special Health Problems | White | 14 | 9 |
| | Negro | 5 | 5 |
| Academic and/or Environmental Retardation | White | 12 | 4 |
| | Negro | 11 | 5 |
| Normal Child - Evaluation Shows No Exceptionality | White | 2 | 1 |
| | Negro | 0 | 1 |
| Total | White | 165 | 86 |
| | Negro | 53 | 66 |
| Total Cases | White | 251 | |
| | Negro | 119 | |
| Total Cases - All | | 370 | |

*For statistical purposes, the most severe problem was tabulated as the primary cause of the child's problems. In most cases the primary problem was either compounded by or resulted in other problems.
Example: Many mentally retarded children also had vision, hearing and speech problems; psychotic children are socially and emotionally maladjusted; etc.

**The cases handled by the speech therapist, 222 receiving therapy and 182 on waiting list are not included, since these will be found on a separate report.

CASES HANDLED BY THE SUPERVISOR OF CHILD WELFARE AND ATTENDANCE
7/1/66 thru 6/30/67

| | WHITE | NEGRO | TOTAL |
|---|---|---|---|
| A. NUMBER OF ATTENDANCE CASES HANDLED | 235 | 293 | 528 |
| NUMBER OF OTHER CASES HANDLED | 342 | 163 | 505 |
| TOTAL OF ALL CASES HANDLED | 577 | 456 | 1033 |

B. EVALUATION OF PRIMARY CAUSES IN ATTENDANCE CASES ONLY

| | WHITE | NEGRO | TOTAL |
|---|---|---|---|
| 1. Community Environment | 1 | 15 | 16 |
| 2. Economic Problems | 11 | 96 | 107 |
| 3. Educational Problems | 31 | 29 | 60 |
| 4. Family Problems | 124 | 109 | 233 |
| 5. Health Problems (Child and/or Family) | 5 | 5 | 10 |
| 6. Personality and Adjustment Problems (Child) | 64 | 39 | 103 |

C. EVALUATION OF PRIMARY CAUSES IN OTHER CASES HANDLED*

| Primary Problems | Race | Male | Female | Total |
|---|---|---|---|---|
| Vision | White | 8 | 23 | 31 |
| | Negro | 22 | 23 | 45 |
| Hearing | White | 5 | 4 | 9 |
| | Negro | | 2 | 2 |
| Speech** | White | | | |
| | Negro | | | |
| Mental Retardation | White | 36 | 24 | 60 |
| | Negro | 17 | 12 | 29 |
| Mentally Gifted | White | | | |
| | Negro | | | |
| Social and/or Emotional | White | 69 | 22 | 91 |
| | Negro | 11 | 5 | 16 |
| Psychotic | White | | | |
| | Negro | | | |
| Crippled | White | 1 | | 1 |
| | Negro | | | |
| Special Health Problems | White | 5 | 10 | 15 |
| | Negro | 9 | 4 | 13 |
| Academic and/or Environmental Retardation | White | 29 | 11 | 40 |
| | Negro | 10 | 2 | 12 |
| Normal Child - Evaluation Shows No Exceptionality | White | | | |
| | Negro | | | |
| Total | White | 153 | 94 | 247 |
| | Negro | 69 | 48 | 117 |
| Total Cases | White | | 247 | |
| | Negro | | 117 | |
| Total Cases - All | | | 364 | |

*For statistical purposes, the most severe problem was tabulated as the primary cause of the child's problems. In most cases the primary problem was either compounded by or resulted in other problems.
Fxample: Many mentally retarded children also had vision, hearing and speech problems; psychotic children are socially and emotionally maladjusted; etc.

**No separate report on speech cases this year. We were unable to find therapists this year. We have over 300 children needing speech therapy in the parish at this time.

CASES HANDLED BY THE SUPERVISOR OF CHILD WELFARE AND ATTENDANCE
7/1/67 thru 6/30/68

| | WHITE | NEGRO | TOTAL |
|---|---|---|---|
| A. NUMBER OF ATTENDANCE CASES HANDLED | 261 | 392 | 653 |
| NUMBER OF OTHER CASES HANDLED | 377 | 223 | 600 |
| TOTAL OF ALL CASES HANDLED | 638 | 615 | 1253 |

B. EVALUATION OF PRIMARY CAUSES IN ATTENDANCE CASES ONLY

| | WHITE | NEGRO | TOTAL |
|---|---|---|---|
| 1. Community Environment | 3 | 21 | 24 |
| 2. Economic Problems | 22 | 63 | 85 |
| 3. Educational Problems | 56 | 84 | 140 |
| 4. Family Problems | 108 | 178 | 286 |
| 5. Health Problems (Child and/or Family) | 27 | 8 | 35 |
| 6. Personality and Adjustment Problems (Child) | 45 | 38 | 83 |

C. EVALUATION OF PRIMARY CAUSES IN OTHER CASES HANDLED*

| Primary Problems | Race | Male | Female | Total |
|---|---|---|---|---|
| Vision | White | 16 | 15 | 31 |
| | Negro | 14 | 22 | 36 |
| Hearing | White | 2 | 5 | 7 |
| | Negro | | 2 | 2 |
| Speech** | White | | | |
| | Negro | | | |
| Mental Retardation | White | 68 | 31 | 99 |
| | Negro | 32 | 15 | 47 |
| Mentally Gifted | White | | | |
| | Negro | | | |
| Social and/or Emotional | White | 71 | 23 | 94 |
| | Negro | 14 | 6 | 20 |
| Psychotic | White | | | |
| | Negro | | | |
| Crippled | White | 1 | | 1 |
| | Negro | | | |
| Special Health Problems | White | 21 | 12 | 33 |
| | Negro | 7 | 5 | 12 |
| Academic and/or Enviromental Retardation | White | 116 | 33 | 149 |
| | Negro | 52 | 17 | 69 |
| Normal Child-Evaluation Shows No Exceptionality | White | | | |
| | Negro | | | |
| Total | White | 295 | 119 | 414 |
| | Negro | 119 | 67 | 186 |
| Total Cases | White | | 414 | |
| | Negro | | 186 | |
| Total Cases - All | | | 600 | |

* For statistical purposes, the most severe problem was tabulated as the primary cause of the child's problems. In most cases the primary problem was either compounded by or resulted in other problems.
Example: Many mentally retarded children also had vision, hearing and speech problems; psychotic children are socially and emotionally maladjusted; etc.

**No separate report on speech cases this year. We were unable to find therapists this year. We have over 300 children needing speech therapy in the parish at this time.